CoRoocR,
In deciding this caso, a doctrine which has been *358 agitated with great ability in the different courts of the United States, as well as those of England, is brought to our view; and it is a subject of great astonishment to observe the contrariety, as we^ as Oration °f opinion which has existed on it. Before I proceed to give my opinion on this case, I can but regret, that a case has been decided in our court on the conclusiveness of the sentence of a foreign court of admiralty, for had I not been restrained by that decision, Walter and Payne v. Bethune, I should have been disposed to say, at once, that they should have no weight with us. That they should not be considered as conclusive in any respect whatever.
When I read the opinion of some of the most distinguisned men who ever graced the English bench, in'which they deplore the comity which lias given such effect to these sentences, and particularly that of Lord Ellenborough, in two very late cases, Fisher and Ogle, and Donaldson and Thompson, in which he says “ the comity by which these sentences are received, is overstrained,” and that he, like Lord Thurlow, shall die in the belief that they ought never to have been admitted ; that they rest on the authority in Shower, Hughes v. Cornelius, 2 vol. 232, which does not fully support them, and that the practice of receiving them often leads in its consequence to the greatest injustice. Camp. 419, 429. When add to this the conduct of the two great belligerents, who have long since ceased to regard the laws and usages of nations, and from some cause or other have subjected almost every neutral vessel which navigates the ocean, to condemnation.' When I discover in the admiralty courts of France, but an echo of the sovereign’s will-, and advert to the open and avowed declaration of Sir Wm. Scott, who has said he would be governed in his decisions by the orders ih council, I cannot but conceive that we are suffering the interests of our fellow citizens to be sacrificed, in permitting the decisions of such tribunals to weigh a feather. I should be reluctant to innovate upon any of the established doctrines of the maritime law, but in a case in which it is obvious that the principles upon which the doctrine was formerly established, cease to exist, I think w= cannot correctly say, that the doctrine itself exists, “ cessante repione cessat et ipsa lex.” Although it.may have been proper to pa? some respect t(j the decision of tribunals which were governed by the laws of nations, and a due regard to the rights of neutrals who might be found on the high seas, it certainly is not proper to respect-the decisions of those who, &olh by their language and acts, declare that they are no logger governed by any known or permanent- standard *359 of justice. Independent of the existing state of things, I think so much favor should not be shewn to courts, in which the judges hold their seats at the will of those who appoint them, in which the parties interested are sworn, and in which, according to the opinion of Judge Cooper, the income of the judge depends in a great measure on the'number of condemnations.
Whilé I regret that any countenance has been given to the sentences of tjiese foreign tribunals, I rejoice to find that it has not been carried to the length contended for'on the present occasion, and to which it has been carried in some of the cases which are to be found in the English books.
The question now before us, is, “ Has the warranty of neutrality in the policies been falsified V’ A condemnation as good and lawful prize is produced in evidence of this. We are gravely told, that the authorities produced, should regulate us in this respect. That it is the decided doctrine in England, that a condemnation as good and lawful prize, is tantamount to a condemnation as enemy’s property. This cannot be the case ; and the latest and best authorities, in my opinion, prove that it is not so.
I should not have thought it necessary to consider what was the Engli^i doctrine at the present day, in this respect, had it not been that one of the counsel contended strenuously, that we were bound to decide according to the English law, on account of some such agreement in the policies. Supposing this .to be the case, I shall merely, refer to Marshal]? p. 411. “ The sentence is only conclusive as to the points whichtit professes to decide.” . And the two cases already referred to, decided by Lord Ellqnborough, as late as 1808, 1 Camp. 418, 429, which decisions were not known,, it ap^ pears to Mr. Justice Cooper when he delivered’his very, elaborate opinion ih‘ the case of Dempsee v. Insurance Company of Philadelphia. But I shall never be induced by any authority, however respectable, to give my assent to what I conceive to be so grossly absurd; • If there were no other grounds of condemnation, than that of enemy’s property, there might be some reason for the doctrine, but when we’know that vessels are daily condemned on other grotmds, to - say, that these courts shall be presumed7 to have .decided on this alone, may suit the interest of underwriting, nations,, arid agree with their notions of right; but I humbly conceive that it * is not in unison with our principles, nor with the .principles of justice. When we consider that the admiralty courts are not deciding on the rights of the insured, in that character, but that .it is enough in them to decide that the vessel or. cargo is good and law- *360 fu] pn'zej the contest being between the owners and captors, is it not absurd, in the extreme, to say the court has decided upon a certain ground, and upon that alone, which, in fact, may never have been before them ?
, As far as the doctrine has been decided m our courts, the weight of authority is against the defendants. In Mayley v. Shattuck, Cranch, 488, Mr. Justice Marshall says, “ these decision’s have never been held to establish any particular facts, without which the sentence may have been rightly pronounced.”
I cannot avoid remarking, that in most of the cases which have' been discussed on this doctrine, there has appeared a strong dispon sition in the parties concerned, and, in some instances» in the judges to*look into the grounds of decision in the admiralty courts. In the first case, in which this doctrine was suggested by Lord Mansfield, Bernard v. Matteaux, he had the proceedings of the court before' him. And in the case now before us, although the defendants relied on this doctrine, they by some means, got into the merits and grounds of the decision of the court of admiralty, for one of the counsel travelling wide of the conclusion of the sentence, says, that proper' papers were wanting as to the eleven negroes, and it was an at. tempt to mask enemy’s property. Upon the whole, I am of opinion# that the decision of the presiding judge was incorrect in this res* pect, and that therefore a new trial should be granted.
As to the case in which the verdict was given for the plaintiff, I am also of opinion that anew trial should Jie granted ; for if entitled to recover at all, he has certainly not recovered as much as was due to him. After abandonment the insured is to be consi. dered as agent for the insurers without instructions. 5 Johnson, 324. And if he éxercise a sound discretion, he is entitled to re. cover what expense he may have sustained on account of the un. derwriters. And here it appears that such a discretion was exer. cised ; for the negroes brought more in New Orleans, than could have been obtained for them in Nassau. The insured are there, fore entitled to the freight of the Euphemia. I am of opinion, that the motion should be granted. *
Nott, J.
The importance of this case is not derived from the novelty of the question, nor its difficulty from want of all the light the subjuct is capable of. For it has been so ably argued and fully considered, both in Europe and America, that a person need only give an opinion on either side, and the reasons on which that opinion is founded will at onco appear familiar to every lawyer. But it is rendered important by the great interest the whole world, I jwy *361 almost say, has lately taken in it, and the effect the ultimate decisions of the courts in the United States may have on the mercantile interest, not only of America, but all the nations of Europe, with whom we have commercial relations ; and its difficulty occasioned by the conflicting opinions of the ablest judges and lawyers in England and the United States. A difficulty no.t a little enhanced by the ■doubt expressed by some able judges, of the correctness of decisions, to the binding efficacy of which they feel bound to submit.
The question whether the sentence of a foreign court of admiralty shall be conclusive in any case on a policy of insurance, is not now before us. This court has already decided that it is so, wherever goods are condemned as “ enemies5 property,” which, I understand to mean, that it is conclusive as to every thing it professes to decide.
Not haying been a member of the bench when that decision took place, I shall give no opinion upon it; but shall consider myself bound by it, until those of- my brethren who then, or now, concur in it, shall feel disposed to review their opinions. That decision appears conformable to the settled doctrine in England. But that it will be re-considered both in England and the United States, I entertain no doubt. Whether it will be reversed or not, I will not pretend to determine.
But the modern innovations made by the belligerent nations of Europe on the laws of nations ; — indeed, I may say, the total disregard they have shown to all the natural and moral obligations by which nations have heretofore been governed, will uot only require a review of opinions bottomed on principles which no longer govern, but will authorize a departure from the most solemn decisions, founded on reasons which no longer exist. I cannot believe that the English judges will suffer the shackles of former decisions long to chain them down to a blind and passive obedience to decrees, founded on evidence unsatisfactory to an honest mind. Judge Gross, 3 Bop. and Pull. 490, “manifestly unjust.” Heath,Justice do., “ founded on Algerine, or worse than Algerine principles, and making the law a stalking horse for piracy.” Ld. Kenyon, 7 D. and E., 696, “ proceeding on a system pf plunder.” Do., Pollard and Bell, ,8 D. and E. Neither will the American tribunals be more disposed to respect the sentences of courts, where the judges’ salaries depend in a great measure on the number of condemnations and their commissions, on the opinion’ of an executive, whose will is law, and with whom power is right. Or of courts where executive decrees are considered in relation to the laws of nations, as the *362 acts of parliament are to the common law. Case of the Fox, 30th March, 1811, Sir W. Scott.
But at present, that question is considered as put to rest. And the.onljf question submitted to the courtis, whether acondemnation as “good and lawful prize,” is tantamount toa condemnation as “ enemy’s property.”
Before I proceed to a particular consideration of this question, I would observe that the English judges do not now submit to the conclusiveness of foreign sentences, because the principle is correct, but because they feel bound by former adjudications, Lothian and Henderson, 3 Bos. and Pull. 499. Fisher and Oggle, 1 Campbell. If, therefore, it can be shown that these decisions are founded on reasons, which do not authorize the conclusions drawn from them, it will at least prove that we are not bound to carry the doctrine further than it has already been carried.
The reasons given by the English judges why the sentence of a foreign court oí admiralty ought to be conclusive in an action on a policy of insurance, are, 1. Because all the world are parties, and therefore all persons ought to be concluded by it. Lord Mansfield, Bernardi and Matheaux, Doug. 554. Park. 355. 2. Because their decisions are governed by the laws of nations, or the obligation of treaties. Lord Kenyon, Desoner v. Ewer, Park. 3(30. Pollard and Bell, 8 D. and E., 437. 3. Because it is a comity due to nations. 5 East, 99.
With regard to the first, the conclusion perhaps would follow if the premises were true. But it is not a fact that all the world are parties. The underwriters never are a party to a suit between the captors and the insured. And the captors are never a party to the suit on the policy. To use the words of Judge Cooper, 71, “ the nature of the actions is different; one is a question of prize, and the other assumpsit founded on contract; the parties are different; the law is different; the testimony is different; the judgment to be pronounced is different, and the effect of it is different.”
• The second is, that courts of admiralty always proceed according to the laws of nations and treaties. But this again is not correct. The courts of every nation feel bound, and are always governed by their own municipal laws and decrees, although they contravene the laws of nations. In the case of Mayne and Walter, Parke, 362, the ship was warranted to be Portuguese, and taken by a French privateer, and condemned as good and lawful prize, because she had an English supercargo on board. But Lord Mansfield declared it to be an arbitrary and oppressive regulation, contrary to the laws *363 of nations; and that the party ought not to be concluded by it. A violation of the late Milan and Berlin decrees, or the British orders of Council, would afford to their courts as good a ground for the condemnation of a neutral vessel, as the .violation of the laws of nations ; and the obligation of treaties is as little regarded. The decisions of the English courts, that the municipal regulations of any one nation are not obligatory on other-nations, and that the sentences of courts, made in pursuance thereof, are not conclusive in an action on a policy of insurance, at once contradicts the opinion that courts of admiralty always proceed according to the laws of nations. Indeed, Lord Kenyon, in the case above mentioned, Pollard and Bell, says of the French courts, that they proceed on a system of plunder. And I presume the English courts will no longer prelend that the laws of nations form the rules of decision in their courts of admiralty, since the declaration of Sir William Scott, that the .orders of the king and council are to the laws of nations what acts of parliament are to the common law.
But, 3d. Finding that neither of the foregoing reasons would bear them out, it is said, that it is a comity due to nations, to respect the decisions of their courts. I understand comity to mean respect, or what between individuals would be called civility or politeness. But it is to be observed that it is only the British courts, and those of the United States that are governed by this “comity.” And if the charges made by the English judges on the French tribunals, “that they proceed on a system of plunder“ on principles manifestly unjust;” “ on-Algerine, and worse than Algerine principles;” “ making the law a stalking horse for piracy;” .that when they shall learn that the manner of wording their sentences, does not render them conclusive, they will adopt such phraseology as will render them so, without regard to the real grounds of condemnation. 1 Campbell, 429. I say, if those charges are true, the French courts have certainly forfeited all claim to respect,' and if we examine the American cases, we shall be led to conclude that the decisions of rhany of the English courts are entitled to but little more regard.
None of the reasons then on which the decisions of the British courts have been bottomed, will support their opinions. The time was when .the laws of nations were respected, and when treaties were regarded as imposing some obligations on nations. The time was, when even England and France were, or at least, affected to be, governed by the rules of common honesty, and their courts of admiralty influenced by a sense of stern morality, [and when courts of admiralty actually did proceed according to the laws of *364 nations, and the obligations of treaties, then, indeed, such comity might be due to them. Then, each nation stood in relation to the other as different districts of the great republic of nations, governed ^ 0116 §reat un*f°rm system of laws. In that view, probably, it tvas, the subject was considered, when it was said, all the world were parties, “ sed tempera mutantur.”
I have already shewn that even Sir William Scott, the great oracle of maritime law, and of the law of nations, who, like Lord Coke, was thought to be not merely the expounder of the law, but the law itself; and who once professed to make the laws of nations the rule of his decisions, finding that he must give up his place, or his opinion, has had the weakness to surrender his principles, and an immortal fame, to sordid interest. For while he reads the laws of nations through the instructions of his government, it is the will of the executive, and not the law, that governs.
Indeed, the English common law judges are so well satisfied that the reasons on which the decisions of their courts profess to be founded, will not bear them out, that they do not now pretend to make them the grounds of their present decisions. Their Jan-guage is “ stare decisis.” Lothian and Henderson, 3 Bos. and Pul. 499. They acknowledge that they follow those decisions only because the law has been too long settled, to be now shaken. Lord Ellenborough says it is by an overstraining comity that these sentences are received as conclusive evidence of the facts which they positively aver ; and that, like Lord Thurlow, he shall die in the belief that they ought never to have been admitted. 1 Camp. 429. I, therefore, repeat again that finding these decisions' no longer governed by principles which formerly prevailed, and that the reasons on which their former decisions were founded, no longer exist, they will not only review those decisions, but will reverse them, if other good reasons cannot be found for their support.
But, without disturbing the decisions as far as they have gone, let us proceed to the question immediately before us, and enquire whether to condemn a vessel “ as good and lawful prize,” is tan. tamount to a condemnation as “ enemy’s property.”
This question may be considered in a twofold point of view. 3. Whether it is implied by the terms of the decree, that it is enemy’s property. 2. Whether it has been so decided by any courts whose decisions we ought to respect, and by which we ought to be governed.
With regard to the first, if there are other causes of condemnation, than that the property belongs to an enemy, which would make *365 it good and lawful prize, then condemning it for such cause does not necessarily imply that it is enemy’s property. Yet it would be condemned as “ good and lawful prize.” If the decree always set forth the grounds and reasons of the condemnation, the difficulty would be removed. 'But we shall find that no reasons will ever be given, if it should be held, that a condemnation as good and lawful prize, without any reasons, should lead to an inference that it. was an enemy’s property, and, therefore, the decree conclusive.
It has already been shown that a violation of any municipal decree or law, however oppressive and unjust it may be, is as good a cause of condemnation as that the property actually belongs to an enemy. Of this, the case of Mayne and Walter is in point. So we have seen that the violation of the late French decrees, or Bri. tish orders of council, is considered in their courts as good a cause for condemnation, as the violation of any treaty or law of nations. And the decree of course declares the property to be good and lawful prize. Nothing, therefore, is more obvious than ihat a condemnation as “ good and lawful prize,” does not necessarily imply that it is enemy’s property.
We may then admit a decree, condemning goods as enemy’s property, to be conclusive, and yet admit an investigation of the grounds of condemnation as “good and lawful prize,” without any inconsistency. And it appears to me absurd to say, that a decree shall not be conclusive, where reasons are given which do not authorize it, and yet admit it to be so, where the grounds of condemnation are the same, merely, because the grounds are not stated in the decree. I am of opinion, therefore, that a decree of condemnation as “ good and lawful prize,” without giving any reasons to justify that decree, ought not to be conclusive, unless the law has been so settled by decisions which we are bound to respect, and by which.we ought to be governed. There does not appear to have been any. decision of this court on the point. In the opinion given in the case’-of Walton and Dagan v. Bethune, it is said, such a decree is not conclusive. But that perhaps ought to be considered as the opinion of an individual judge, and not the opinion of the court, because the point was not then before the court. But it is sufficient for my purpose, to say, it decides nothing as regards the principal case, and, as far as it is to be regarded, accords with my opinion on that point. In the case of Salona v. Woodmas, Parke, 363, Lord Mansfield held a sentence of condemnation, as “ good and lawful prize,” conclusive, although no special ground was stated. But in the case of Calvert and Bouville, 7th D, and E., 523, Judge *366 Laurence says, that “ if it is ambiguous, or it does not appear on the face of the sentence, on what ground they proceeded, then we may receive evidence to show what were the grounds of the decision abroad.” AncJ in the case of Fisher and Oggle, 1 Camp. 418, the sentence was held not to be conclusive. That was an action on a policy of insurance on the Juno, represented as an American ship, which had been condemned in a French court of vice-admiralty in Martinique. The sentence of condemnation was in these words, “ that it resulted evidently from the papers on board, that the expedition of the said ship Juno, her cargo, and the operations of her captain on the coast of Africa, were for account of the brothers Geddes, merchants of London, who had, to mask the English property of this outfit, borrowed the American flag and passport of the said ship Juno, and taken for their agent and partner in this expedition, captain Fisher, furnished with a certificate of citizenship of the United States. It then goes on to condemn ship and cargo as “ good and lawful prize,” without stating any specific grounds for the condemnation. Lord Ellen,borough said, “ we show sufficient respect for French sentence's, if we attach credit in our courts to what they distinctly say. It is often painful to go this length, considering the piratical way in which they proceed. But this sentence does not say that .the ship was not American, and it is not to be considered as evidence of what it does not specifically affirm. A verdict was found for the plaintiff; and on a motion for a new trial be says, “ It is by an overstrained comity that these sentences are received as conclusive evidence of the facts which they positively aver, and on which they specifically profess to be founded,” The other judges were of the same opinion, and a new trial was refused.
The English decisions then on the point appear to be both ways; but the most modern are against the conclusiveness of foreign sen. tences, where the property is condemned merely as “ good and lawful prize,” and where there is no specific ground of condemnation stated. And such is the modern, belligerent code as affords no ground to extend the comity of nations. Treaties and the law of nations afford no security. It is truly said, “ that in the iniquitous conflict between British orders and French decrees, scarcely a ves. sel navigates the ocean, that is not subject to the denomination of “ good and lawful prize,” upon the text of the new belligerent code. Scarcely one escapes the rapacious grasp of the British or French cruisers, which like so many robbers infest the high road of nations. And an insatiable court of admiralty stands forever open to seize *367 «pon its prey, “ s(.d vestigia nulla retrorsum.” And if one fortunately escape condoratiation, “ hasret lateri lelhalis arundo” The delay, the expense, the vexation attending trial, are often worse than condemnation.
From this view of the subject, I have come to the conclusion, that the decree of a foreign court of admiralty, condemning a vessel or cargo, as good and lawful prize, without assigning the grounds and reasons of that decision, ought not to be conclusive in an action on a policy of insurance. And, therefore, a new trial ought to be granted in this case.
Smith, J.
The first policy on the schooner Lucy, and the second policy on the fifty negroes, a part of her cargo, are both so intimately connected with the third policy, on the eleven negroes, and their fate so interwoven therewith, that, believing as I do, the sentence of condemnation of the court of vice-admiralty, at Nassau, is conclusive to falsify the. warranty of neutrality of that part of the cargo, I shall, without further investigation, upon that ground alone, object to a new trial on the first and second policies. It will necessarily result, therefore, that we bestow some more attention on the third verdict given on the third policy.
The defendant’s counsel in this case contended, that they were not liable on the policy, because it was vacated by the sentence of condemnation in the vice-admiralty court, which completely falsified the warranty of neutrality.
On the part of the plaintiff it was contended, that the sentence of condemnation was not conclusive, and that he ought to be admitted to go into proof, in the Court of Common Pleas, to shew the neutrality of the property. In support of this position, the authority of Fisher and Oggle, 1 Camp. 418, was relied on, where Lord Ellenborough says, “ he must look to the adjudicative part of the sentence, and there he finds nothing distinctly stated as to the ship or her cargo not being American,” &c. From this opinion, it is argued, that the judges in the English courts, where it is said this doctrine of the conclusiveness of a foreign sentence originated, have themselves abandoned it; and that they now allow these sentences to be opened in actions between the insured and insurer, in order to examine if the condemnation has proceeded on the laws of nations, or on such treaties between particular nations as have been engrafted upon them, as well as to give the insured an opportunity to prove the neutrality of the property, which was formerly denied to the insured.
It were to be wished that the reporter in this case had been a *368 little more copious. It appears to me that the short view which he has given of it, and the grounds on which the decision went, is toe limited to authorize us in saying that it ought to control all former decisions ,0n the same subject. I cannot easily be brought to be" lieve, that the English courts have now, for the first time, opened their eyes upon the correctness of this doctrine, and are themselves beginning to correct the error. Nor could I easily be brought to believe that there is more honesty, or more learning, on the Eng. lish bench at this time, than what has existed there since the time when Lord Holt came on it. We have no reason to believe, that-the British courts have, at any time, been mor6 under the influence' of, or had stronger inducements to, corruption, than at present.Yet, we are called upon to believe this to be the only instance of purity to be found in the system of English jurisprudence, upon this important legal question : and which is to weigh down all the solemn decisions of Holt, Mansfield, and other eminent judges, for more than a century back.
In addition to this authority, the plaintiff's counsel offers the opinion of Judge Cooper, one of the late judges of the State of Pennsylvania, given in the case of the Assignees of Brown v. The Insurance Company of Pennsylvania. This opinion was much relied on to elucidate this question. Yet, notwithstanding its celeb, rity, and notwithstanding it may be correct in many of its positions, it cannot be received as authority. For it is to be recollected, that Judge Cooper stood alone in this opinion, and that there were five other judges, to whose opinions much respect, no doubt, is due. They all differed from .the opinion held by Judge. Cooper. Then, so far as opinion goes, there were five to one against him. There, fore, by a majority of five to one, this important question is .settled in the large and commercial city of Philadelphia, and State of Penn, sylvan ia, that the sentence of a foreign court of admiralty directly upon the point of neutrality, is conclusive, in an action between the insured and underwriter. It appears to me, that the opinion of Judge Cooper is tod critical and censorious, and not sufficiently dispassionate for a fair investigation. He mentions the cases of Pollard v. Bell, and Bird v. Appleton, to prove that the English judges have shifted their ground, and, varied their decisions. But it will be found, upon looking into these cases, that they afford no such evidence of inconsistency. The case of Pollard v. Bell, was brought before the Court of King’s Bench, upon a case stated by the parties, in which the grounds were specifically set forth, upon which the French courts of admiralty had founded their decree: *369 fetid which' xvas the violation of a French ordinance of 1778. The Court of King’s Bench did not arrive at this ground by letting in parol ■ evidence, but it was contained 'in the sentence itself, from which it was manifest that the condemnation was not founded on a breach of the laws of nations, or on any particular treaty engrafted on them. In the case of Bird v. Appleton, the Court of King’s. Bench had the case brought before them on a special verdict. Special verdicts are, for the most part, agreed on by the parties liti--gant, or found by the jury. This special verdict furnished the-court with evidence, that the condemnation was founded on a violation of the decree of the executive directory, and not on a viola-tion of the laws of nations ; and the court declares expressly, that-it was on this ground alone, that the insured was let in to contest the sentence of condemnation of the court of admiralty. The judges also expressly say, if these sentences had not furnished the' evidence that they were founded on a breach of private ordinances# they would have been bound to respect them..
This appears to have been the principle constantly adhered to by the English courts, and not a novel one adopted to suit the occasion. The principle is also recognized by the Supreme Court of the United States. In the case of Rose v. Himely, Chief Justice Marshall, in delivering his opinion, said, “ if the court of St. Domingo had jurisdiction of the case,- its sentence was conclusive ; if it had no jurisdiction, the proceedings were coram, non judice, and must be disregarded.” His opinion was concurred in by the other judges. 4 Cranch. 276.
When this case first came on to be argued, I conceived the question had been settled in this court in the case of Walton and Pagan v. Angus Bethuno, at the January term, 1811. That was an action on a policy of insurance to recover from defendant five hundred dollars, the amount of the sum by him underwritten. This insurance was made on goods, wares, and merchandize, belonging to Walton and Pagan, citizens resident in Charleston, on board the brig -, from Port Republic to Norfolk in Virginia. On the trial of this cause, before the Circuit Court, it was in evidence that the brig on the 1st of February, 1804, with her cargo on board, sailed from Port Republic for her port of destination in Virginia. On her voyage she was captured by a French privateer, and soon afterwards recaptured by a British man of war, and carried f.o Kingston in Jamaica, there libelled, and a restitution of the brig and cargo was decreed, except twenty hogsheads of coffee; respecting which, there was an interlocutory decree of condemnation, unless- *370 further proof of its neutral character should be adduced within a time then limited. This proof was not furnished, and for want thereof, the court of admiralty by its definitive decree, condemned coffee as belonging to enemies of Great Britain, or otherwise. The defendant contended that the condemnation falsified the, warranty of neutrality, and was conclusive. But the presiding judge thought otherwise, and permitted the plaintiffs to go into evidence to establish the neutrality of the coffee, which was done to the satisfaction of the jury, and they found accordingly for the plaintiffs.
That case, and the one before us, are extremely alike in all their material circumstances. But it is said the sentences conclude differently. In that case the conclusion is “ as belonging to enemies of Great Britain or otherwise.” In this case, “asgood and lawful prize to the captors.” And this constitutes such a difference as will authorize the court to open the case, and let the plaintiff into proof of the neutrality of the properly, in the action between him and the underwriters.
I know that the decision, and the unanimous decision of the court in Walton and Pagan v. Bethune, in which they granted a new trial, proceeded expressly on the ground of the conclusiveness of the sentence of a foreign court of competent jurisdiction. The same authorities, both English and American, which are now relied upon, were brought before the court in that case; with the excep. tion of the case in 1 Camp., and the policy of the rule was not questioned by the court. The English authorities equally support both conclusions. In the case of Salancu v. Woodmas, the ship Thetis, warranted a Tuscan ship, was captured by a Spanish vessel, and condemned as “ good and lawful prize.” Lord Mansfield, who delivered the unanimous opinion of the Court of King’s Bench, said, “it must be presumed from the condemnation, as no other cause appears, that it proceeded on the ground of the property belonging to an enemy.” Par. 472. Mar. 291. The English courts make this distinction, that “ good and lawful prize,” if the ground on which the decree is founded be given, and that ground a breach of private ordinance, or any other not warranted by the laws of nations, is not conclusive. But if it be a general sentence of con. demnation, without assigning any reason, the courts will consider that it proceeded on the ground of the ship’s being the property of an enemy. Le Blanc, J. in Pollard v. Bell, 8 D. and E., 446, 4.
It is said that England is the only nation that holds this respect for the conclusiveness of the sentence of a foreign court of admiralty, and that we ought not to be bound by their decisions, but *371 should adopt a'course for ourselves.. But why are we to burst the bands asunder now ? Are we not as much bound by English decisions of this description as of any other? Do not the same reasons and causes lead thereto, which induce us to give them so much weight in all our other legal decisions ? Are we not every day laying hold of the English decisions, ancient as well as modern, and adopting them as our own ? Or are there any books of reports in higher esteem, or in more frequent use in our courts, than the English reports, compiled from decisions made both before and since the American revolution. Our legal system is engrafted on them, both by authority and by long aud familiar usage.
We were told, and it was pressed with no little zeal-in the argument, on the part of the plaintiff, that the British government had lost sight of the laws of nations, and that captures and condemnations are now made under orders in council, paper blockades, &C., that this court ought to set their faces against it, &c., and that their judges are corrupt, &c. ■ I am willing to allow, as I verily believe it to be a fact, that the British government regards the laws of nations no further than comports with their own convenience ; and that the courts of admiralty, to speak in the language of Lord Kenyon, will often be found to proceed upon Algerine, and worse than Algerine principles. But I hold it to be a position not to be controverted, that the evil can never be corrected, nor even diminished, by the aid of our common law courts. They may give anew complexion to the decisions on policies of insurance; but they never can check the rapacity of the British cruizers, or change the decisions in their courts of admiralty. If, by opposing their sentences, you could bring the correction home to the captors, or to the judges of the courts of admiralty, you might hope to redress the grievance. But what does Lieut. Foley, or the judge of the vice-admiralty court at Nassau, care, whether this court will let the plaintiff into proof of the neutrality of the goods or not. Lieut. Foley has got his share of the plunder, and the judge of the vice-admiralty court, to use the language of Judg*e Cooper, has got his fifteen pounds, and that is all they care for. David Bailey and the insurance company may try the case forty times ; and Lieut. Foley and the vice-admiralty judge will know nothing about it.( Great Britain has constantly refused to listen to the peaceful remonstrances of your ministers, when they have sought a redress of this grievance ; can it then be expected that the feeble energies of a court of common law can oppose the smallest barrier to the unprincipled xavagers upon neutral rights ?
*372 J cail foresee one evil, bat I can foresee no good, that may result from a decision against the conclusiveness of the sentence of a fo. ¡reign court of admiralty. It will give a little more scope to specu. Nation. If you let in the insured to prove the neutrality of his .-goods after condemnation, he need give himself no trouble to do •so before the court of admiralty; that burden will be imposed on the underwriter. It seems to be verified in the case before us. The schooner Lucy was captured on the 24th July, 1806. On the 11th of August, plaintiff offered to abandon to the underwri. ters, which they refused. On the 24th of August, the cause was suspended, for more than two-months, to give the owners an oppor. tunity to interpose further proof of the neutrality of the goods. When .the further proofs were offered, they were insufficient, and the property was condemned. Then the plaintiff turns round, and says to the underwriters, if I could not make proof of the neutrality of my goods in the court of admiralty, I can do so in the Common Pleas, And thus it becomes a mere matter of speculation.
It is argued by plaintiff’s counsel, that the necessary papers to establish the neutrality of the goods, were taken away by Lieut. Foley ; therefore, they could not be had at the trial. But we fiud that Captain Hudson, of the Lucy, has been examined upon inter, rogatories, and he says not a word about them. The Captain was the agent of the plaintiff. He gave testimony for them, and he certainly knew the papers that «were necessary to establish the neutrality of the vessel, as well as her cargo. They ought to have been produced, or accounted for. It is made a distinct ground by defendants, against the new trial, that the vessel was not sufficient, Jy documented, nor the property insured ; and if the papers were not produced, or accounted for, it is evidence of that defect. It is indispensably necessary to have the sea-letter, which specifies the nature and quality of the cargo, the place from whence it comes, and its destination. Mar. 317. And it is decided by the whole court in the Slate of New York, “that a warranty of neutrality, in a policy of insurance, imports, not only, that the property is neu. tral, but that it shall be accompanied on the voyage with all the accustomed documents, to insure it respect as such, within■ the laws of nations.” i N. Y. T. R. 564. The plaintiff in this action, gave no such evidence of necessary papers, on the trial in the Circuit Court. And this would seem to be a sufficient ground against the new trial, independent of any other,
I would further observe, that notwithstanding the alledged cor. *373 OTption of the British courts of admiralty, it is strongly to be inferred, from the circumstances attending this trial, that the condemnation was for the want of proper documents of neutrality. The schooner Lucy, and the fifty negroes in the second policy, ■were acquitted without any difficulty, and with very little delay: but the eleven negroes insured on a different policy, belonging to a .different owner, and destined to a different port, were condemned. And this after a long delay, in favor of the claimant’s further .proof. If the court intended to act corruptly,- why let go the ■schooner Lucy, and why let go the fifty negroes, and only retain the eleven 1 why not make a bold stroke, and condemn the whole ? 'The papers would have been as easily concealed or destroyed for the whole, as for a part; and the inducement must have been infinitely stronger.
It is not for the sake of comity towards other nations, that I ■would maintain the conclusiveness of a foreign sentence. If that •were the only ground, I would yield my opinion, because I think ¡that mere respect to another court, or another nation, ought not to interfere with-the fair administration of justice between individuals. But I think .it has for its basis other objects of infinitely greater Importance, the giving uniformity, permanency, and universality, ■to a principle of law, without which, private property is insecure, and private rights uncertain. Moréover it puts a period to litigation.; an ohject much sanctioned by our legal principles. If it •were otherwise, the courts of our country would be constantly un-ravelling the decisions of another. It is an established rule of the Engiis'h law, that a fact which has been once directly decided, shall not again be .disputed between the same parties. Peake, 34. And a man who, on being sued., suffers judgment by d.efault, will not .afterwards be .permitted to recover back the money, though he can shew, by the .clearest evidence, that he has paid it before. ' Peake, .35, 7., 269. These rules of law have been scrupulously adhered ito by our own courts; and even against the evident justice of the case. Not for the sake of shutting their eyes upon the rights of .the party, and looking at the respect due to another court, but solely to put an .end to litigation, otherwise it must be perpetual. The same fact has been decided in anothér court, the court of ad. miralty,; and it is literally trying the same fact over again, to hear it in this court. And it is a doctrine, which will not be considered as applicable, to say “ one of the parties to the suit abroad, is not a party here : one of the parties to the suit here, was not a party before the court abroad.” Cooper’s Opinion, 70. This argument *374 miSbt we^ use^ by defendants, who were not a party to the admiralty suit; but it must come with an ill grace from the plaintiff, who has been a party to the suit abroad, and now a party to the s(1‘t; at borne, where he wishes to try his rights over again, which he cannot do without violating that principle of law so sacred in our own courts, as well as the English, “ that a fact which has once been decided directly, shall not again be disputed between,” &o.
It is urged, that the British doctrine, if pursued here, would prove very ruinous to the mercantile interest. I deny the position. To fair and honorable enterprise it cannot. Where it is otherwise, it is not the object of law to give protection. A merchant may insure against any event in the course of his lawful enterprise. Insurance is a matter depending on contract between the parties. Let the merchant then insure against unjust condemnation ; this would not be unlawful. Modify his insurance so as to embrace every risk. This would be sanctioned by our courts óf justice. The merchant, it may be said, cannot do this ; it would enhance the premium too much. But it is not the merchant alone who is to be protected in his rights. The underwriters are equally enti-tied. The honest and enterprising merchant is a useful member of any community. But insurance gives life aud security to commercial enterprise, without which, it would often dwindle into nothing. In the business of insurance, the insured cannot'be imposed upon. It is not in the power of the insurer to do any act which can affect the property insured, either in promoting or impeding its success to its port of destination. The insurer stands perfectly passive. He may be useful, but cannot be dangerous or corrupt. Fraud and collusion, from the nature of his employment, are placed beyond his grasp. On every insurance he may reap a small profit, or sustain a heavy loss. On the other hand, it is in the power of the merchant to change the destiny of the property insured, by smuggling, by false papers, counterfeit flags, British license, violating embargo laws, &c., without mentioning custom house oaths, which are so little respected. If these adventures succeed, the profits go to the insured, if they are detected, it is to be devolved on the insurer, if possible. If there is a condemnation, the sentence must conclude “ as enemy’s propertyor we are told that the sentence must be opened, and a new hearing had in the Court of Common Pleas, and a second chance given to offer proofs of the neutrality, &c., or it will-prove ruinous to this class of your citizens. The laws are not to be strained to suit any class or description of men. If *375 they werg, I see no ground' to bestow it on the merchant to the injury of the underwriter. I am against the new' trial.
Bkevaed, J.
I shall first consider, and give- my opinion in the case respecting the eleven negroes..^ The verdict in that case was for the defendants. The decree of the British-^ice-admiralty court at Nassau, which was given in evidence, was in these words: “ The judge having heard tl)e further proofs read, and advocates and proctors on both sides thereon, pronounced the same to be in. sufficient ; and decreed the said property to be condemned as good and lawful prize to the captors.” The presiding judge, at the trial in the District Court, instructed the jury to consider this decree as conclusive to falsify the warranty of neutrality, and the jury found accordingly. I am of opinion this instruction was erroneous, and that the plaintiff is entitled to 9. new trial.
In the case of Walton v. Pagan, which was determined in this court,'in January, 1811, the' terms’of the definitive sentence of condemnation, though, in most respe'cts, similar to that now under review,, was, intone circumstance, .materially different. In that case, the coffee insured was condemned, “ as belonging to the enemies of^Great Britain, or otherwise^” In the opinion of the court, as it was, expressed oh that occasion, it was manifest on the fa<?e oFthe decree', that the condemnation was on the ground of enemies’ property, and on np other-ground, and, therefore, it was deemed conclusive to negative the warranty. 'And it seemed to be admitted' by the court in that case, that if the sentence had been general/ or had been expressed in ambiguous terms, so as to leave it uncertain, whether the condemnation proceeded on the ground of enémies’ property, 0/ some other ground, it would not have been considered conclusive. The opinion of the court,, as delivered, was, that the terms in which a foreign judgment is expressed, in order to have the effect contended for, roust be so positive and explicit, as to negative, by necessary 'construction, the warranty of neutrality.
If, in the present case, the decree was thus positive and explicit; or if the condemnation had been “ because the negroes were not neutral property,” as in the case of Fernandes v. Dacosta, Marsh. 290, I should not be inclined to disturb the verdict. But I am averse to extending the effect of a foreign judgment, and especially admiralty decisions, further than they have been -already permitted to go, in conformity to the doctrine of English courts. Lord Mansfield, in the case of Saloucci v. Woodmass, Park, 361, lays it down, that a condemnation, “ as good and lawful prize,” without stating *376 any special ground, is conclusive that the warranty- of the property as neutral, was untrue. But if it can be collected from the sentence, that the condemnation was for some other cause, as for re»fusing to be searched, or making resistance, it ought not to be’ deemed conclusive. Saloucci v. Johnson, I Marsh. 292. In the case of Calvert v. Bovil, 7 T. R. 528, the sentence declared the’ the brig in question to “ be a good prize for the benefit of the cap-tors,” and this was held not to be conclusive to falsify the warranty. But it seems other reasons were assigned for- the sentence,than that of the vessel’s being enemies’ property. The court,however, appears to have founded its decision on the’general ground, “ that it could not be collected from the sentence itself, on what-ground the foreign court decided.” Upon this plain,-solid foitnda»tion I rest my opinion in the present case. A foreign judgment1 is received in our courts, as conclusive evidence on any subject, on' which tt has been pronounced, as to those points it professes to de-" cide, if within its jurisdiction ; but it is only to be considered so” far conclusive as it is positive and clear in its decision. I’ cannot-bring my mind to consent to the doctrine of Lord'Mansfield, “ that' if the condemnation be general as good and lawful prize, and no’ reasons are assigned, nor any special ground stated, it must neces»-sarily be inferred, that the condemnalion proceeded on the ground-of enemies’ property.” I adopt the opinion said to be delivered by-Lord Ellenborough, in the case of Fisher v. Oggle, 1 Camp. 418,. in which case the condemnation was “as good and valid prize,”' without stating any specific ground. “ We shew,” says his lord-ship, “ sufficient respect, if we attach credit in our courts to what foreign courts distinctly say. The sentence of a foreign court is conclusive proof of what it specifically affirms. The adjudicative' part only is to be regarded, and so far only as it positively and spe»' cificaliy affirms.” In the case under consideration, the conclusion' insisted on can only be established by way of inference. Whether this inference may be fairly deduced from the generality of the decree, or from other parts of it, than that which has been brought' into the view of this court, I am not curious to know. I am satisfied that the general rule, as to the conclusiveness of foreign judg.-ments, will not justify the verdict; because it is not positively and specifically affirmed in the decree in question, that the negroes were" condemned as enemies’ property.
I now proceed to give my opinion, in the case of the schooner. In this case, also, the verdict was for.the defendants. The judge" who presided at the trial, in charging the jury in this case, and in *377 the case of the fifty-two negroes, delivered himself to this effect. “ The eleven negroes taken on board the schooner, were con-detnned as good and lawful prize ; the presumption is, that the condemnation was on the ground of enemies’ property, because no . , , ‘ , . contrary reasons are assigned in the sentence. This presumption not being repelled, is equal to positive proof, and conclusive to falsify the warranty of neutrality. Then, as the negroes were justly forfeited as enemies’ property, and as they were found on board the schooner, the schooner was thereby exposed to seizure and detention ; therefore the underwriters are not liable.” The judge, however, doubted whether this reasoning ought to extend so far, as to affect persons interested in the’ fifty-two negroes, who were not interested also in the eleven negroes condemned. Upon the whole,however, he inclined to think the insured were all liable to sustain the loss pro rata. The jury most probably were governed by this advice and direction, in giving their verdict for the defendants, in . the case of the schooner ; although they were induced to find for the plaintiff, in the other case concerning the fifty-two negroes.
As the logic, by which the jury were convinced, is not quite satisfactory to my mind, I must take the liberty of dissenting from it. The reasoning of the court may be reduced to a syllogism something like this. The schooner was not condemned as good prize, but was considered in the light of'neuftal property : and as such, was acquitted, and ordered to be restored to the owners. But eleven negroes, part of the schooner’s cargo, were condemned as enémies’ property, whereby the warranty of those negroes was falsified : therefore the warranty of the schooner was likewise falsified. But this conclusion seems to me to be a non sequitm\ Thi's case is not like those where tbe goods of a neutral are so mixed tyth those of a belligerent, that they cannot be distinguished one from the other. The schooner was warranted neutral property, and was acquitted. The conclusion must be, that she was not proved to be other than neutral. The indemnity claimed is for damages sustained by the perils of the sea. It seems to be no answer to this claim to say, that she -was unjustly captured and detained.- Unlawful capture and detention, is one of the perils in--sured against. It seems to be no good objection to the claim, to pretend that part of the cargo on board was enemies’ property, because that property alone is liable to forfeiture, and not other property which is neutral. Í cannot reconcile to myself the propriety of holding, that, because a mau has warranted a negro to be neutral property, and the negro is condemned as enemies’ property, h* *378 no*: indemnified for a loss, by the capture and detention of a ship, and by the perils of the sea, it there is no other cause for disputing the claim to indemnity, than merely because the negro hap-Penec^ t0 ke f°un(i on board the ship. The doctrine insisted on, would push the comity of nations off the stage entirely ; for it would not give credit to foreign judgments, even when they happened to be in favor of neutral commerce : or else it would pay such an absurd deference to them, as to give them credit for what they do not pretend to say, and even contrary to what they say.
I now come to the case of the fifty-two negroes, in which case the verdict was for the plaintiff. With this verdict, the plaintiff is not satisfied ; but as it is by no means cleár to me, that the Verdict is not according to the justice of the case, I am opposed to granting a new. trial. The brief states that the vefdict is for $856 60 ; being the amount expended by him in clothing and provisions for the negroes, while at Nassau, excluding all compensation for the hire of the brig Euphemia. The contract of insu-ranee, is a contract of indemnity for all losses within the policy. The inquiry must be, was this loss within the policy, and what was the extent thereof? Damage by capture and detention, and damage by the perils of the sea, were insured against. The ne-groes were claimed as enemies’ property, and detained for trial, and in the mean timetsome of them perished. The claim was dismissed, and the property was restored to the assured. The detention was therefore illegal, and the assured are entitled for all losses thereby sustained. Every loss must be imputed to its immediate, and not to any remote cause. It is stated in the brief, and I quote that, because it is always presumable the appellant will give his case the best complexion, “ that the vessel and cargo received great injury whilst lying in the harbor of Nassau, by a violent storm, and many of the negroes died.” Now, nothing certain as to the extent of the loss, can be collected from this statement. How many of the negroes died ? What were the approximate causes of their death? Did they die in consequence of any cause immediately arising from any of the dangers insured against? Was their death imputable to capture and detention, or sea-damage ? Did any of them perish by natural mortality, or by other causes, not within the policy, and how many ? I concede, that the loss was at one time total, by the ‘capture; and that the plaintiff had a right to abandon, as he did. But the defendants did not accede to the offer to abandon, and did not pay the loss ; and the negroes were af-terwards released. In the final event, the loss was not total, but *379 partial; and the plaintiff is entitled to no more than an indemnity for the loss actually sustained. I am- not convinced that the . loss is more than the jury have allowed by their verdict. I doubt if it is even so much. It is an invariable rule, that the loss must be ap-predated according to the prime cost, adding all duties and expen. ses, and also, the premium of insurance. Marsh. 535. How much was the property diminished in value, by any of the perils insured against; and what was the value of that loss, in proportion to the whole value? These are - questions which cannot be answered with any certainty, from the evidence reported in the case.
As to the hire of the brig Euphemia, I lay that out of the case, as irrelevant matter. Suppose the freight had been insured, is it not evident that the plaintiff’s right to indemnity would have been against the insurers on the freight, and not against the insurers on the'ship or cargo ? But the plaintiff was his own insurer as to the freight, and must therefore bear the loss, which happened on that score. As between the insured and the underwriters upon the cargo, it is a contract of indemnity, and the latter has nothing to do with the freight. The owner of the Ship has a lien on the goods for his freight. Marsh. 628. It was the duty of the freighter to carry the negroes safely' to the port of destination, and feed, and perhaps clothe them, on the passage. The allowance for provisions for the negroes, was in my opinion illegal; but as the defendants do not complain thereof, I aiñ for leaving the ver. diet unmolested.